Good morning. May it please the courts. The case before us this morning is a case pending trial. It is a state appeal. There is a related case, an unlawful use of weapons case that occurred in April 2002. At that time the defendant, and the defendant has been convicted of that UUW in a stipulated bench trial in 2003. At that time the defendant was arguing with his wife, or his girlfriend rather, the mother of his children. She had been out. It was 3 o'clock in the morning. They were arguing. The argument heated. The defendant was unarmed, but he left the bedroom, went downstairs, retrieved a gun, came upstairs, and while the victim's on the watch, he loaded the gun. They continued the argument. She was lying on the bed. He was sitting on the bed. Her head was in his lap. He took the gun, placed it to her forehead, and pulled the trigger. It was a click. It was an empty chamber. Then he raised the gun above her head, aimed it at the wall, and fired the gun into the wall. During this entire time, his family was there, present, sleeping in another room, not in the same direction that the bullet was fired. The bullet from the wall was later recovered, bullet 4934. This bullet was part of the UUW case and was part of their trial. It was stored as part of the UUW case. Two months after the unlawful use of the weapon, Velma was found dead in her bed. Same bedroom, same bed, a single bullet to the brain. It was a .38 caliber bullet fired in the UUW, a .38 caliber bullet found in her brain. After the children were interviewed, the youngest child, who was not quite four, gave a statement to the children's center saying that it was her daddy who shot her mother, and that her daddy was in fact the defendant, Eric Lover. There was a challenge to her competency to testify. At the end of the day, the state acknowledged that case and went forward on the UUW. As I said before, there was a stipulated bench trial to the UUW finding her guilty. The defendant admitted that he fired the gun but said it had been accidental. Years go by and the state re-investigates the case, re-interviews the daughter who was found with the mother who was almost four at the time. At this point she is 12. She is interviewed again at the children's advocacy center. Another sensitive victim statement from her. This time she says she does not recall the incident at all, does not recall making the statement implicating her father, and does not recall the incident at all. The trial court says that she will admit both of these statements at the trial. The issue then comes to the bullets. There is a bullet found in the wall from the UUW, bullet number 4934, and a second bullet found in the brain of Velma Franklin, the victim, bullet 4935. The first bullet, the bullet involved in the UUW, was in good faith destroyed. The police had it stored with the UUW, had failed to link that with the murder, and in a routine purge thinking the case was over, he had been sentenced and served his time. Unfortunately, this was after the trial court had ordered discovery in the re-indicted murder case. She found that the destruction was in good faith, but as a sanction for the destruction, she decided that the bullet should be, the trial court decided that the bullet should not be admitted at the trial. She said this was because there was a discovery violation, and also because the forensic experts... Thank you. I apologize. The comparison of the bullets, the forensic evidence comparing the bullets, could not be admitted at trial. Bullet 4935 does still exist. This is the bullet found in the victim's brain. The other bullet, 4934, does not exist. Thank you. There was a comparison, though, made by the forensic experts back in 2002, and there was testimony about their comparison. And so the dispute now is about whether the testimony from the state should be admitted. It's our position that the entire controversy, that the testimony from both the state's witness and the defense witness, should be presented to the trier of fact, so the trier of fact could evaluate the evidence, the comparison. Rather than disallowing it, this evidence should go to the weight of the evidence. So it's our position that the entire debate should be allowed to be presented to the trier of fact. The defense witness says there's a variance in the measurements of the lands and groups. He is correct. That is well documented, carefully documented. I'm sorry to interrupt you, but I want to understand the trial court's ruling. She prohibited the introduction of the forensic report and expert testimony regarding the comparative analysis of the two bullets. Did she preclude you from offering evidence that a bullet was recovered from the wall? I do not believe so. Her exact wording is, the just remedy is an imposition of an order prohibiting the prosecution from the presentation of evidence identifying the destroyed projectiles as being fired from the same weapon as a projectile recovered during the autopsy. Can't you still put on the other crime's evidence where he held the gun to her head? Yes. All right. So the judge's ruling was a bit of a compromise, excluded forensic analysis, but allowed introduction of the fact that the bullet was recovered from the wall. Yes. Even still, from our position, the comparison, the evidence of the comparison is critical to our case because it puts the same gun in his hand both at the time of the EUW and two months later at the time of the murder. So we have the modus operandi evidence to help show his identity. If he's using the same gun, it's critical to us to be able to show the jury that. If it's a bench trial, it might be a different story, but if it's a jury trial, that link, I think, is critical. It's that comparison evidence that we're asking this court to allow to be admitted. There is a dispute about the measurement of the bullets. There is a dispute about the lands and roofs. The bullet that went into the wall was mutilated. When it hit the wood inside the wall, it must have hit a joist, although there is no testimony that it hit a joist, but it hit wood. It was taken out of wood. It was mutilated. It was bent so that part of the bullet measured one way and part of the bullet measured another way because it had been crunched. So the difference in the lands is in the bullet that had the impact on the wall from the EUW, the lands measured 0.05 to 0.06, and in the bullet that went into her brain, it's 0.06. Again, the bullet that went into her brain did not have the same impact, so there was no mutilation, no crunch to the bullet. I think this is a fairly minor difference here because the 0.06 is on both bullets. The grooves, I think, is where the greater issue is. In the bullet that went into the wall, the measurement was 0.10 to 0.11. In the bullet that went into her brain, it was 0.12. This hundredth of an inch is the main focal point of the dispute among the experts. I'm having trouble understanding why it's relevant that he held the same gun on both occasions. Why is that critical in terms of your young certificate? Why is that critical to the prosecution? The fact that he held a gun and discharged a bullet into the wall two months earlier... So, of course, the issue for the murder is identity. This happened when the body was found that morning. The eyewitnesses that were in the house two months earlier will identify him as the person who fired the bullet into the wall, correct? Yes. Okay. So now we need to link that he is the one who fired the bullet into her head two months later at the murder. And you think if he proved the same gun? I think if he had the same gun... Why couldn't somebody else hold the same gun at the time of the murder? Someone certainly could, and that certainly can be argued by the defense. But I think if he's holding the same gun, that adds a lot of weight to his gun. Okay. I think that adds a lot of weight to the identification. I appreciate you helping me understand the impairment issue for your going forward with the prosecution. Thank you. Thank you. Anyway, that's what we're after, is to link that to help strengthen the identification testimony that he was the shooter. Because the evidence that we have that he was the shooter was the child who was not quite four who said then that he was the shooter, and says now she doesn't know, she doesn't recall. So trying to link that. You run the risk, don't you, that the jury may find that there's actually some significance to the difference between the lands and the groups on one and the other. It looks like the trial judge may have done you a favor. It's absolutely. There's absolutely the risk that we run that the jury could find that that hundredth of an inch is significant. There's a difference among the experts. The state says a hundredth of an inch does not make a difference, and the defense says it's everything. There's absolutely that risk. It's our position that we're taking the risk. We would like the opportunity to take the risk so that the jury can evaluate, listen to all of this evidence about the dispute, and evaluate whether that, in fact, the bullet was fired from the same gun, whether the defendant was the one who committed the UW and also the one who committed the murder. That's where we're taking that risk. We're hoping that we can take that risk. So anyway, at the end of the day, that is the difference, is that one hundredth of an inch in the measurement of the groups. That is the difference. And I realize that the standard we're looking at here is whether or not there had been an abuse of discretion. I realize that that is a very high standard for the state to overcome. But it is our position that her ruling was because the evidence was destroyed in good faith and because the forensic experts were relying on their notes as opposed to independent recollection, those two things were enough to exclude the comparison of the two bullets. But, again, in every expert case, every test, any time an expert testifies,  rarely does an expert have an independent recollection, certainly not a forensic expert. An independent recollection of a blood scanner or a bullet, that's almost never going to happen. So I think the basis for her ruling, in fact, was an abuse of discretion. In fact, does reach the level of being arbitrary. This evidence could be presented to the jury. And in the case I cited in my brief, People v. Sykes, the state had, in a circumstance very similar to this, the police had inadvertently destroyed 150 pieces of evidence, all of the physical evidence in the case. And at the end of the day, the judge allowed the evidence, referenced the evidence, to go into the trial, to be admitted to the jury, along with a limiting instruction that said, the presumption here is that the missing evidence would be adverse to the state. We were asking, we asked the judge for a limiting instruction like that. We certainly accept that if this court should rule in our favor, that a limiting instruction like that would go in. And at the end of the day, we think that this evidence is helpful to us, is critical to us, and that the trial court abused her discretion in refusing to admit the comparison of the bullets. And we ask you to reverse your ruling. Next question. You know, the murder charges were filed in 2002. That's why it's a 2002 CF number. And then they were dismissed in 2003 when the competency of the young girl was challenged. We just elected to go in the UUW at that point. And then I think the case just was dormant for a while. The defendant was in jail on unrelated charges. And frankly, I think when his term was coming to its conclusion, you know, we looked at his case, his background, and looked at this again and said, you know, is there something we can do here, someplace we can go? Thank you. Good morning, Your Honors. May it please the court, my name is Mario Plattis. I'm an assistant appellate defender with the Office of the State Appellate Defender. And I represent the defendant appellee, Eric Glover. Your Honors, the resolution of the issue on appeal here is really simple. It starts and ends with the standard of review, abuse of discretion. The state this morning, in response to Your Honor's question, concedes that if the trial court might have done it a favor when it ruled the way it did. That concession is basically the end of the story. Once the state acknowledges that what the judge did could have benefited it, that means a reasonable person could agree with what the court did. And under the abuse of discretion standard, the state is required to show, not just that the trial court acted irrationally, fancifully, or arbitrarily, but that it acted so irrationally, so arbitrarily, so unreasonably, that no one could agree with it. And I think, again, once the state comes in and says, yes, the remedy we actually got might be better than the one we asked for, we're in the territory of six of one, half a dozen of the other. And the state can't meet its burden under the standard of review. In this case, the state doesn't dispute that it violated the discovery rules. The state doesn't dispute that the court had broad authority to craft an appropriate sanction. The only thing we're doing this morning is haggling over the details of the remedy the court imposed. But the standard of review prohibits this court from micromanaging the court's evidentiary rulings in that manner. The record here, we're talking about a discovery sanction. And in the context, when the ruling in question is a discovery sanction, if the record shows that the court's ruling was narrowly tailored and it doesn't prohibit the state from prosecuting the defendant with the evidence that remains, that's the end. There's really nothing else to talk about. The state doesn't seriously contend that this case can't be prosecuted without this one piece of evidence, nor could it. And that, essentially, under the case, again, I mean, that's the end of it. Once we look at the court's ruling, if it's narrowly tailored, if it allows the state to continue with the prosecution, that is sufficient to find that the court did not abuse its discretion. There isn't a single case in the state's briefs that suggests that the trial court was required to go along with its proposed remedy. The cases the state discusses in its briefs and here today, one of them is Julio C. In Julio C, the court excluded some evidence. The defendant, or I'm sorry, the court excluded some evidence. The state appealed. And the appellate court, on appeal, reversed the, I'm sorry, I'm mistaken here. The court actually dismissed the charges. And on appeal, the appellate court ruled the dismissal was too much. It remanded the case. It suggested that the trial court could admit the evidence with this limiting instruction, but it didn't require it. The other case the state relies on is People v. Sykes, which is discussed here today. So in Sykes, what's important to know is that it wasn't the state who asked for the instruction. It was the defendant. And he got it. The issue on appeal was whether the trial court should have actually dismissed the charges. And so in addition to that, the evidence that was excluded, this 150 pieces of evidence, all of it had been deemed inconclusive with respect to whether it connected the defendant to the crimes, which were sexual, I believe it was aggravated, criminal sexual assault, aggravated kidnapping, and attempt murder. So the excluded evidence didn't actually demonstrate that he was involved. And more important, the evidence almost certainly had no effect on the case. The victim survived. She testified at the defendant's trial, and she positively identified him as the person who attacked her. If that weren't enough, the defendant confessed to the crimes. So whether this evidence came in, didn't come in, wouldn't have mattered in that case. And it doesn't even suggest that the trial court in Glover's case had no discretion to reject the state's proposed remedy. As to the measurements, I mean, I can't say this enough. The variations in the measurements, Mr. Shirk's strange explanation for how he determined the rifling direction on the destroyed bullet, and for that matter, Mr. Shirk's personal error rate, as the state calls it, which the state claims is zero, none of it matters. Okay, when we're talking about a discovery violation, the problem with the state's argument is that the trial court's broad discretion to craft an appropriate sanction does not depend at all on whether the defendant can show that the state might be wrong about the evidence it destroyed. I mean, the argument is essentially self-refuting, and even if it weren't, the Supreme Court's decision in People v. Gladys shows that it's wrong. Gladys was a DUI case. The destroyed evidence was a video of the defendant driving her car, getting pulled over, and performing field sobriety tests. The excluded evidence was the testimony of the police officer who saw her driving, who stopped her, and who gave her the field sobriety tests. There was no question in Gladys that the officer didn't accurately remember what he saw. There was no question in Gladys that the officer may not have, you know, correctly administered the field sobriety tests, nor is there any question that he misinterpreted the results of the tests. The only question was, was the state required to produce this video? It was. The second question was, did the court abuse its discretion when it excluded the officer's testimony? It didn't. The court's remedy, the exclusion of the video, which, by the way, was a lot broader. Like, the exclusion there was much broader than the one we have here. The Supreme Court approved the exclusion anyway, and found there was no abuse of discretion because the state could still prosecute the defendant for driving under the influence of alcohol with whatever this officer saw before the video started and whatever he saw after the video started. In Glover's case, even if there were no questions about the measurement variations, even if Shirk did not give a strange explanation for how he determined the rifle indirection, and for that matter, even if his personal rate was actually zero, Glover still had a right to have an expert examine the bullet. The state still violated discovery when it destroyed the bullet. The trial court still had broad discretion under Rule 415 in related cases to exclude the evidence that they were fired from the same weapon. And no statute, no Supreme Court rule, no judicial opinion says the trial court was required to go along with the state's proposed remedy. I do want to briefly address, if I can do it briefly, the argument as to Mr. Shirk's personal error rate. So in his opening brief, the state argued that there was at most a 1% chance that Mr. Shirk got the identification wrong. In his reply brief, the state doubles down, if that's the right way to put it, and claims that his personal error rate was literally zero, that the, quote, accuracy of his identifications has never been challenged by a certified examiner. I don't want to over-explain this, but a rate is a fraction. There's a numerator, there's a denominator. The denominator in this case would be the number of times Walter Shirk concluded two bullets were fired from the same gun, and a second examiner independently reworked the bullets, that is, independently determined their class characteristics and their individual characteristics. The numerator of the fraction would be the number of times another second examiner disagreed with Shirk's conclusion. The record doesn't contain a number for the denominator. I can't say it enough. There's no number. The state, in its reply brief, suggests that it's approximately 3,000, but it cites page 933 of the report of proceedings, which is not Walter Shirk testifying. It's Robert Puntin testifying about his own work,  Shirk said he'd worked on thousands of cases, but, again, didn't specify what type of analysis he did in any of them, and he didn't specify whether a second examiner or how many of those cases a second examiner would have gone in and reexamined the evidence he had worked on. The state police have this verification process that involves two people, but it's important to understand that this process doesn't involve a second person independently examining the evidence. The second person looks at the first person's notes and then looks at the bullets under the microscope. The second person doesn't re-weigh the bullets, doesn't re-measure them. It's all based on whatever the first person finds. Now, in the vast majority of cases, from a quality control perspective, this is probably okay, because in most of those cases, if the defendant has a question about whether the bullets matched, he's going to get a chance to have his expert examine them, and that obviously can't happen here. Shirk did say that he had testified in approximately 310 firearms cases, but again, he didn't specify what kind of analysis he did in these cases, whether it was identifying bullets, whether it was checking the firearms for operability, et cetera. Nor did he say in how many of them another examiner would have gone in and independently evaluated the evidence behind him. Shirk's supervisor talked about the accuracy rates of firearms generally. He talked about the certification procedures the office is subject to. He talked about the procedure he has for assigning five cases a year at random to another examiner to look at, but he didn't give any specific information about how many times Walter Shirk's work is evaluated. The fact that the record doesn't contain a number for this denominator is fatal to the state's argument. It can't be sustained because it depends on something that is not in the record. As for the numerator, which is again the number of times the second examiner would have disagreed with Shirk, the state claims that number is zero, but the record, specifically Walter Shirk himself, contradicts that claim. Shirk said that in at least two or three firearms cases, another examiner had disagreed with him. Now, he didn't specify what he did in those cases and what the disputed conclusions were, but that just means that the record is ambiguous, and because it's ambiguous, it has to be construed against the state and against its claim that that number is zero. Again, none of this makes any difference. Even if Walter Shirk were the greatest firearms examiner who ever lived, even if his historical error rate were zero, he's not an infallible being. He is a government forensic scientist who could have made a mistake here. And more to the point, even if his error rate were zero, Glover still had a right to have an expert examine the evidence. The state still violated the discovery rules when it destroyed the bullet. The trial court still had broad authority to craft an appropriate sanction, and that included, under Supreme Court Rule 415, that explicitly authorized the court to exclude evidence. Thank you. And nothing in our law required the trial court to accept the state's proposed remedy, and nothing in our law requires this court to go along with it either. To prevail here, again, the state had to show that the judge acted so fancifully, so arbitrarily, so unreasonable, that no reasonable person could agree with what she did. Again, the state this morning agrees that there is a risk that the thing it's asking for is worse than the thing it got. That's the end of the analysis. And for that reason, this court should affirm the trial court's ruling. If Your Honor has any more questions. Thank you, Your Honor. I thought, Justice McDavid, in response to your question, I had agreed that we were taking a chance to put in front of the jury all of the evidence. I did not think I was conceding that reasonable minds could differ. So that is my position, that we are, we admit that there is a risk,  And I think that's a good thing. In fact, our entire position here this morning is, we would like the opportunity to put all of this evidence in front of the trier effect. All of this controversy, the defense experts, the state's experts, in front of the trier effect and let them decide. We think there was no reasonable basis for the trial court to decide to exclude the comparison altogether. That the evidence, certainly the conflict in the evidence, goes to the weight of this evidence, but not to its admissibility. Our whole argument is that the trial court did not have a reasonable basis to exclude the comparison. Rather, the entire controversy should be put in front of the trier effect. And so we ask that this court reverse the ruling of the lower court. Thank you. Thank you. And thank you both for your argument today. We will take this matter under advisement. Thank you. Thank you. Thank you.